Good morning. My name is Joy Hercardillo. I'm an attorney with the Arizona Center for Law and the Public Interest, and we represent the petitioners in this matter. I would like to reserve a couple minutes of time for rebuttal. Before I launch into the Clean Air Act with all of its acronyms and deadlines and details, I thought it was important to kind of step back and look at the bigger picture here. When we talk about particulate matter pollution, we're not simply talking about the brown cloud that mars the scenic views in Phoenix and keeps us from seeing the beautiful mountains. PM10, or particulate matter pollution, kills people. The Arizona Department of Environmental Quality estimates that more than 500 people in Maricopa County were killed each year, or I should say die prematurely each year, because of particulate matter pollution. And the elderly, asthmatics, and children are all particularly vulnerable to this form of pollution. So this case, although we obviously delve into a lot of statutory minutia, is not just about statutory nitpicking. This really is a matter of public health and the public's right to breathe clean air. And in Phoenix, that's a right that we simply cannot take for granted, because for the past 20 years, Phoenix has exceeded the national standards for airborne particulate pollution. And rather than address this problem aggressively, unfortunately the state of Arizona has consistently resisted implementing the Clean Air Act requirements. So as you look at the history of Phoenix, when the state has acted, it has largely been in response to lawsuits or under the threat of sanctions. Now Phoenix, as a result of a lawsuit, was reclassified serious nonattainment for PM10 in 1996. That means under the Clean Air Act, it has an attainment deadline for PM10 pollution of December 31, 2001. That also means that in its Serious Area Implementation Plan, or its SIP, it must include the best available control measures, and those measures must be implemented by June 2000. Now both of those deadlines have been missed in Phoenix. And in fact, Phoenix continues to violate the 24-hour and annual standards. In 2002, six sites violated the 24-hour standard, and five sites violated the annual standard. So in the Serious Area Plan that Phoenix has submitted to EPA for approval, they have sought an extension of the attainment deadline under Section 188E. Now in order to qualify for that extension of time, the Clean Air Act in Congress was very clear. They said that you must demonstrate that your plan includes the most stringent measures that are implemented in any state, either through its SIP or just implemented in any other state, and can feasibly be implemented in your area. Now the EPA says, well, they have. Okay, they have demonstrated that they've got the best available, or the most stringent measures. Let's go there. And are qualified for the extension. What degree of deference under Chevron do we owe to that determination by the EPA? Because the statute is unambiguous. In this case, we don't get past the first step in Chevron. This Court does not owe any deference to EPA's interpretation of the statute. The statute unambiguously requires that the area plan include the most stringent measures that feasibly can be implemented in the area. Now EPA has acknowledged that one of the most stringent measures that's been identified by the state, the carb diesel, the clean burning fuel, that that measure is not infeasible. But EPA has asserted in approving this plan and in its brief that it can approve a plan and approve an extension under 188E, even if the plan doesn't have all possible MSM, or most stringent measures in it. That's what EPA has said in its response. That's its position in this litigation. And that's its interpretation of the statute requiring most stringent measure, right? Correct. So what you're arguing is that that's an unreasonable interpretation. Correct. It's contrary to what the express language of the statute has said. Because what EPA has said is, well, we realize that there's this MSM out there, this carb diesel, and the state has not demonstrated infeasibility. But we can go ahead and approve this plan anyway, even without all the MSM in it, because the statute says that the state has to demonstrate to the satisfaction of the administrator that the plan has MSM. So that requirement that the demonstration be to the satisfaction of the administrator, that gives us discretion to approve in this instance. And then the EPA has offered a justification for why they say this MSM, this carb diesel, isn't necessary. They say, well, it doesn't advance the attainment date. That may be a legitimate reason, but that is not the reason that Congress has authorized an extension. And I think with respect to this particular issue, what is very instructive are the three cases that we cite in our reply brief on page 14. They're three cases that were decided in 2002 by the D.C. Circuit, the Fifth Circuit, and the Seventh Circuit. And those cases deal with the extension of the attainment deadline for ozone. And in that particular, those cases, what EPA had done is adopted a policy where in cities or areas where the nonattainment was due to upwind emissions of ozone, so it wasn't something that was within their control, EPA adopted a policy of granting an extension of the attainment deadline. And all three courts in those cases said, you can't do this. Congress has very, very specifically set out those circumstances when EPA is authorized to grant an extension of the attainment deadline. The attainment deadline, the courts have recognized, is the heart of this Clean Air Act. This is the stick that gets states to actually implement the Clean Air Act provisions. And what the D.C. Circuit, Seventh Circuit, and Fifth Circuit said is Congress has spoken to this issue. We don't get past step one on Chevron. EPA's discretion is very clearly delineated in the statute, and EPA, you can't make up a reason that Congress didn't give you to grant the extension. And that's precisely what EPA has done here. They've said, okay, you haven't quite met the requirement of MSM, but we're not really going to care about it because it wouldn't advance attainment. That is not an exemption that Congress has authorized, and EPA has acted in excess of its authority. It's also, I think, important to recognize that that whole approach that EPA has adopted here is inconsistent with everything EPA has said historically about how the statutory framework works with the Clean Air Act. Because the longer you're in nonattainment, and the more we have to push this deadline out, the increased stringency that is required. So by the time you get to, for example, a BACM analysis, Best Available Control Measures, EPA has said we shouldn't be considering attainment deadlines at this point. You're so far out of attainment that increased stringency is what we're focused on. More measures is what we're focused on. And if you get to attainment sooner rather than later, that's great, but that's the goal. That's even more true under MSM analysis, and that's according to EPA's own guidance. So this is not only a departure from the express language of the statute. This also represents a departure from EPA's whole historic approach to this ratcheting up of the stringency of the requirements. Counsel, on the MSM, as I understood, EPA's reasoning was that EPA has to measure attainment in year increments. Is that contrary to the statute? No. What EPA is talking about is, yeah, when you're talking about an annual standard, you're looking at the annual average. So while the air may be measurably cleaner at the beginning of a year, you're not going to really reach, quote, attainment until you get to the end of the year. So that was the rationale that EPA offered with respect to, well, this is why we're looking at whether it would increase attainment by one year. Our position is the whole goal of the Clean Air Act is that we reach attainment as expeditiously as possible. But when we talk about attainment, we can't lose sight of the bigger picture, which is cleaner air faster, as fast as possible. Is that accounted for under the BACM standard? The MSM standard is a comparative standard. It requires Arizona to implement the best measures that have been, I shouldn't use the word best measures, the most stringent measures that have been implemented elsewhere before EPA can grant it an extension. We have to assure ourselves that Arizona hasn't done everything that at least every other state that's doing something has done. Correct. Before we can give them an extension. If the deadline, if their attainment won't be moved up by the one measure that EPA has, that is a yearly measure, why is that contrary to the statute for EPA to say, if we can't measure the difference, then we can't conclude that this is mandated by the statute as MSM? Because the statute defines MSM as the most stringent measure that has been implemented in any state anywhere. The statutory definition or the statutory provision doesn't speak to whether this adoption of this measure will hasten attainment. That's something that EPA has interpreted and read into the statute. The statute simply says black and white, if you want this extension, you have to show, you have to demonstrate that you have the most stringent measures, exactly as your Honor said, that you have done everything every other state has done that's feasible. There is a recognition that if it's not feasible, it doesn't have to be included. But if it's feasible, it's got to be in your plan in order for EPA to even have the discretion to grant the extension. What is the showing of feasibility or non-feasibility in this case and who has the burden of proof? Historically, what EPA has taken the position is that with respect to RACM and BACM and MSM, I apologize for the acronyms, they're unavoidable. With respect to those, the burden is on the state to either demonstrate that they are, that they can't be implemented, to come up with a reason, justification for why they can't be implemented. And the presumption is in favor of the control measure being implemented or adopted by the state. So the burden is on the state, and that is the way EPA has consistently interpreted the Clean Air Act, that the burden is on the state to either demonstrate, and that's consistent with the statute, because the state always has to make the demonstration and then EPA evaluates. And with respect to carb diesel, there was no demonstration of infeasibility. The state took the position that it was economically infeasible, but EPA declined to accept that justification and, in fact, made no judgment on it, found that the data was too uncertain with respect to economic feasibility. And stepping back to the BACM analysis provided, and as we detail in our brief, provided no reasoned justification for rejecting carb diesel as BACM. So just looking at the statute, it says, in referencing the burden of proof, it says, and the state demonstrates to the satisfaction of the administrator that the plan for that area includes the most stringent measures that are included in the Implementation Plan and can feasibly be implemented. So even if the standard is that it must be to the satisfaction of the administrator, the state still has an obligation to show that it cannot be feasibly implemented. Correct. And you're saying they did not even put in any evidence to show that. No, the state did submit evidence. EPA declined to find that the state had established infeasibility. EPA said, we make no judgment on this with respect to carb diesel. Now, if I can clarify, because we've also challenged with respect to the agricultural control measures. Right, right. There, the state did not. The state said, oh, this would require an influx of money and research for us to justify these controls. So the state got it completely backwards. Because this is about, when you're in nonattainment, like Phoenix is, you know, these controls are justified unless you can show that there is a reason justification why they should not be implemented or that they're infeasible. It's not, you don't have the option to just say, well, this could be economically infeasible, which is precisely what the state did with respect to agricultural controls. They just didn't even try to make a choice. They didn't make any demonstrations, so we don't know whether they actually met the standard to the EPA satisfaction. Right, right. If I can just refer to my notes just a minute. Well, we could talk about BACM, BASM and RASM. BACM. Well, with respect to BACM, again, EPA has been clear in its guidance that was published in 94 and consistently over the past almost ten years now, that the state must identify available control measures. And where those measures, where the state fails to implement those measures, the state must provide a reason justification. Now, in approving this plan, EPA stated in that approval that the state had done that in this case, but that isn't true with respect to carb diesel because with respect to carb diesel, EPA found that it was not going to, that the state had not adequately showed infeasibility, economic infeasibility. So the state rejected, or EPA rejected that as a reason for not having carb diesel as BACM. But in our opening petition, we mistakenly understood EPA as finding a substitute reason justification, as this doesn't advance attainment. But EPA now, in their response, says, no, you were incorrect. That's just with respect to MSM that we offered that. Rather, what we found was that when you look at the source categories, and we evaluate BACM source category by source category, and when you look at the source categories for on-road and off-road emissions, the state has BACM because they have this very stringent program. But what EPA is doing here is incorrect for two reasons. One, they've lumped diesel emissions, which can be controlled by a single control measure of carb diesel. They've kind of manipulated the categories by saying, oh, on-road and off-road emissions. And then they cite all this BACM that relates to gasoline engines. So it's not even controlling diesel emissions. Counsel, they did have other measures that would address diesel emissions. They did have a few measures that address diesel emissions. And as we point out in our brief, they're either voluntary or implemented well beyond the BACM date. There is no diesel measure that is comparable or a substitute for carb diesel. And they provide no justification whatsoever for rejecting carb diesel. There's no reason justification for that. And the other point is that historically, as EPA has laid out the analysis, it is measure by measure. That is the way that the EPA has instructed states to analyze this. You identify the measures by source category, but EPA has been unequivocal that if you reject a measure, you have to have a reason justification. And in the case of carb diesel, that simply isn't the case. Counsel, EPA, excuse me, the MAG plan did go through measure by measure, didn't it? It did. It did, Your Honor. And it rejected carb diesel. No, that's correct. And the TSD from EPA follows that as well. Correct. So they did go through measure by measure. Our problem is that they rejected carb diesel and EPA can't adopt Arizona's explanation for why they rejected it. Correct. That's exactly correct. If there are no further questions, I'll reserve my remaining time for rebuttal. You may do that. Thank you. And now we'll hear from the EPA. Oh, dear. That's a good way to start. As long as you don't throw it at us. Good morning, Your Honors. My name is Angeline Purdy, and I represent the Respondent, EPA. I'd also like to introduce Jan Taradash of EPA's Office of Regional Counsel, who's with me at counsel table. Now, Petitioners started by saying that we should step back and take a look at the bigger picture, and I agree with that. But there's another bigger picture to be considered here, and that's that although all of this discussion and argument is focused on a couple of very narrow measures, the overall SIPP revision that EPA approved here adopted some really comprehensive controls on PM10 emissions. There are on-road and non-road motor vehicle emission controls that have led to programs that, with respect to non-road engines, go well beyond federal standards, and on-road standards that EPA has characterized as some of the most comprehensive in the nation. There's an agricultural dust control program that is only the second in the country aimed specifically at controlling fugitive dust from agricultural sources. And there are a number of other controls that aren't even at issue here, controls on unpaved roads, on paved roads, on construction sites, on vacant lots. So there was a lot that was done in this plan, and I think it's important to keep that in mind and not lose sight in the focus on these two specific measures of what is actually being done to address this indisputably serious PM10 attainment problem. Counsel, the petitioners have argued in their brief that diesel emissions are a significant source that is considered independent of the other sources that are found in the larger source category. I didn't see any place in your brief that you disputed that contention. In fact, as I read your brief, you denied that EPA treated any of these as de minimis. EPA did not. Neither the state nor EPA treated any source categories as de minimis for purposes of the MSM analysis. There were some source categories that were de minimis for purposes of the BACM analysis, but none of those are at issue here. Diesel emissions are part of the larger set of on-road or non-road engine emissions. Right, which as a source category you found to be significant. Yes, correct. Now, the petitioners, of course, have now focused specifically on diesel emissions and contend that diesel emissions standing alone are a significant source. Now, EPA itself declared that the source category that Arizona had identified was probably overly broad and it probably should have been divided into at least four source categories, one of which would have been diesel emissions. Well, as I believe has been indicated, there are also other controls on diesel emissions. So, you know, we've talked a lot about carb diesel, but there are controls, even if you were to consider diesel emissions as sort of a separate subcategory, there are controls on that category. But that gets us to are they the best available control measure in this case? I noticed in your brief at one point you were quoting from the statute and you said that you quoted that standard from the statute as being a best available control measure. And I wanted to ask you about that. When the statute uses the term the best available control measure, isn't that pointing to the best as opposed to a universe of possible bests, which would constrict your discretion to choose among the various controls that might get at diesel fuel emissions? Well, I think the key statutory term is best. The best. The best. The best. Well, what does that mean? Why did Congress use the words the best? Within the concept, whether it's the best or a best, the very concept of best suggests that there are some measures out there that aren't best, that there's some discretion to look at all the measures that are available and choose only those that are the best controls. And that's what was done here for the source categories that were actually used in the analysis for the on-road and non-road engines. Have I answered your question? I'm sorry. Well, when EPA construes that language, it does seem to me that there could be good technologies and there could be better technologies and then there could be the best, and that here it would seem that carb diesel is the best, or at least I haven't seen anyone argue that it's not the best. Well, it's not the best in the sense that it is not a control methodology that either the State or EPA concluded was required for this particular plan to have reached the best available control methodology. But Arizona offered an explanation. That's correct. And EPA said, well, we don't know whether they're right or not, and then offered no other explanation itself. How can it turn down a proposal either as BACM or as MSM without offering any explanation? Then EPA characterized the issue under MSM, but not under BACM, as to whether it could approve as MSM carb diesel in the absence of a reasoned explanation from the State of Arizona. The State of Arizona provided a justification here. Now, EPA took no position one way or the other on that justification. EPA did have an independent basis for concluding that carb diesel wasn't required, and that basis is stated in its finding that the overall strength of the Motor Vehicle Emissions Program was such that carb diesel simply wasn't required for that plan to reach BACM levels. So the question is, assuming that there's a requirement that a State provide a reasoned justification, what's the consequence if the State provides that justification and EPA doesn't necessarily accept that but can conclude based on its own review and its own independent judgment that the plan proffered by the State satisfies, contains BACM, and also satisfies the requirements for an extension under Section 188? Well, that's interesting because what you have, it seems to me, is a difference of view on what it is the statute requires. Your position is as long as we think the plan that's submitted will get cleaner air, to use the vernacular, that will be fine. Opposing counsel reads the statute as saying if you're at a certain level of nonattainment, you must use these measures, however they are identified. Whether or not something less would also eventually get you to cleaner air. And if opposing counsel is correct about the construct, then your explanation, as you've just described, it doesn't fit. Do you understand my problem? If the statute says you must do A through Z, and you say, well, we're approving something that's only A through L, but it'll be just as good, that really isn't responsive to the statute. If the statute means what opposing counsel has said, and I think that's been possibly where my colleagues' questions are pushing as well. Well, in talking about the statute, are you referring specifically to Section 188E, to the MSM requirements, or more generally to the BACM requirements, or to both? Both. To both. With regard to the provision requiring that a serious area have BACM, that requires the best available control methods. There's always going to be some judgment call as to what constitutes those best methods. With regard to the MSM provision specifically. Do you agree or disagree that the carb diesel is the best mechanism? It is certainly an available control mechanism, but it was not determined to be a best mechanism with regard to the Phoenix area. Was it evaluated by the EPA as to whether or not it was the best available control measure or mechanism? I don't know that it was evaluated. I mean, what EPA was looking at was the fact that there was already an extensive control program in place. You're not answering my question. Yeah, my question was, was the carb diesel as a mechanism for controlling the significant diesel fuel problem evaluated by the EPA, standing alone, as to whether it was the best mechanism available? Did EPA evaluate that specific measure in isolation? Did it evaluate it? I'm sorry, I'm just making sure I understand your question. It did only in the sense that it looked at the reductions that were expected to be achieved from carb diesel, but did it conduct an independent evaluation of that particular measure? I'm not aware that it did. Look, the reason I'm asking the question is because in the CFR rules, your procedures for determining best available control measures, which were published in 1994, it goes through the step-by-step basis of how you're supposed to determine what's the best available control measure. And the third step says evaluate alternative control techniques. And I just don't see where the EPA did that in this case for carb diesel. I beg your pardon. The procedure that's outlined there is, yes, is the process by which a state starts by looking at all available measures and narrowing them down until they've identified the best measures. Now, in this case, the state did that. They went through that process. At the end of the process, their reason for rejecting carb diesel was that they concluded that it wasn't economically feasible. Now, EPA didn't accept that justification, but it concluded that carb diesel was nonetheless not required. So, no, it did not go through the full evaluation process that is outlined in the regulations, as far as I'm aware. But if you don't accept the state rationale, shouldn't you either have your own rationale or some justification or some explanation or something that we could look at to see that you were proceeding appropriately? Well, the rationale stated, and this is stated, I believe that the key pages to look at would be the respondents' excerpts of record at 53 to 54 and 123 to 124. EPA's discussion of, again, the overall controls on this source category and of the fact that while EPA's statement that carb diesel would not significantly reduce emissions was a basis for concluding that it wasn't required as a most stringent measure under Section 188E. But although independent, although attainment demonstrations, excuse me, although attainment ordinarily doesn't, isn't supposed to play a role in a BACM demonstration, EPA also wasn't required to ignore reality in looking at whether the state was required to include this measure. This is a measure that would have gotten the state about .8 metric tons per day by 2006. It would take five times that amount, four metric tons per day, for the state to be any closer to attainment on the annual standard, which is the only standard really implicated by diesel emissions. Seems like we're going around and around here because closer attainment is not the standard for BACM, so that's not. Let me ask you briefly about the agricultural aspect of this, which hasn't been discussed very much. But if you would just recap for me why, in your view, it was acceptable not to adopt the requirement for a greater number of control measures to be taken in order to reduce agricultural dust and particulates. In looking at the agricultural dust problem, the state was really starting from ground zero. This was a problem that was only identified in 1997. And so the state went out and looked at possible measures of controlling that problem, including looking at the South Coast's Rule 403 in handbook, which is the alternate measure that petitioners had pointed to and said, well, there are more measures adopted in this, therefore it's more stringent, therefore this is what you should have done. In developing the general permit program that the state adopted here, what they did was they looked at what kind of farming practices were in Arizona as opposed to California, what the needs of those farmers were, and they ultimately concluded that because farming is so varied, because each farm may have unique needs, unique practices, it just isn't possible to impose a single set of controls on every single farm. What they adopted, therefore, was a structure that's a very common structure for the control of fugitive dust, which is to create a menu of choices and let the individual operator, let the individual farmer, decide which of those choices are best suited to dust control on their particular land. Now, it's not the case that you could simply say, well, why don't the farmers have to do everything in a category instead of only doing some of them? Some of those provisions are going to be mutually exclusive. For instance, there may be several different ways of creating a windbreak. A farmer wouldn't have to do all of those. Some farmers may not have all the particular kinds of land at issue. So you're dealing with a highly variable situation, and against that background, what the state concluded was that requiring each farmer to adopt one practice per category of land, that was enough for the plan to contain the BACM level of control and also the most stringent measures that were feasible for Arizona. Well, what's wrong with the alternative argument that more than one such measure was required rather than one in each category? Well, part of the problem is that the petitioners are trying to compare, to simply compare across the board, programs that are applicable to sort of two different areas, a number of the concerns having to do with their different weather conditions, different types of agriculture, a number of things between the South Valley and Arizona, that it doesn't necessarily translate into a point-by-point comparison such that if you require a certain number here, you can require a certain number there. It's also not clear that, in fact, the South Coast requires quite as many practices as petitioners say they do. Again, there's some variability. But what Arizona was faced with here was a real lack of knowledge as to not only the burdens that would be imposed on farmers but also the incremental benefits that they would get from requiring additional practices. So instead of imposing, requiring those farmers to adopt additional practices, what they did was they said, well, if each farmer does one per category of land, that's going to be enough to demonstrate that we'll be in attainment on this, that this category will be progressing towards attainment and will be in attainment by the end of 2006. It's not feasible to try and impose more when we don't really know what the costs would be or what the incremental benefits of those measures would be. What the state did instead was to commit to monitor on an ongoing basis and make sure that they really are getting the reductions they think they're going to get from this program. And if they don't, then they're going to be readdressing that. I'd like to talk just briefly about one other issue that was addressed, and that's this whole question of Section 188E and the discretion, the degree to which EPA has discretion under that statute. We tended to focus on the most stringent measures provision, but Section 188E as a whole, what that provision does is it authorizes EPA to grant extensions in the attainment date under certain circumstances. And it's easy to lose sight of the fact that that is really sort of what is ultimately confining EPA's discretion under that statute, is the requirement that any extension be as short as possible. Now, the particular phrase that applies to MSM, what it specifically says is that the state has to demonstrate to the satisfaction of the administrator that the plan for that area includes the most stringent measures that are included in the implementation plan of any state or are achieved in practice in any state and can feasibly be implemented in the area. Petitioner's interpretation would seem to read that to the satisfaction of the administrator, read that right out of the statute, because even if that weren't there, EPA would always have the ability to look at a state's demonstration and say, well, no, you don't have some MSM in here, therefore you haven't met the standards. What that is designed to do is to give EPA the discretion to look at a demonstration overall to conclude, to determine whether or not it includes all feasible MSM, but to also look at that with an eye towards the ultimate goal, which is attainment as quickly as possible. And that's ultimately the question is, does this plan have everything in it that it can have so that this area is going to attain as quickly as it possibly can? I would disagree that this language is absolutely unambiguous. I think we have here a question of EPA's reasonable interpretation of that statute. Terms such as feasibility suggest that there's room for interpretation here, and in that context I believe that some deference is due to EPA's reasonable interpretation of that. I was just going to say feasibility is quite a narrow grant of discretion, though. If all that EPA is allowed to determine is whether a state has properly or improperly determined that the laundry list of good acts, some of them are feasible or not feasible, that's a fairly narrow window of interpretation. Well, I don't think the discretion only – see, that's the concern, is that I don't think that that discretion extends only to saying, well, are these feasible or aren't these? It extends to, overall, have the states demonstrated that they have included everything that is feasible for their area? There can be a number of different concerns built into that question of feasibility, so it isn't just is it feasible or isn't it, but does overall, does the demonstration made by the state show that they have included all of the stringent measures that are feasible in their area? Does that answer your question, Your Honor? I'm sorry. I think I understand what you're saying, that there are a lot of aspects to feasibility. I have a question. It's a practical question. What were to happen if we were to decide that an extension was not warranted in this case? Well, I think it's important to keep in mind that what was really driving the length of the extension here were matters that aren't even at issue in this case. What was really driving it was that there are certain improvements the state is making that are going to take capital investments that extend out over a number of years. So if the Court ultimately disagrees with EPA's reasons for the reset. Or if we find that they didn't give a reason. Or if the Court concludes that for whatever reason it disagrees with the state of the record on that, The appropriate remedy here is not to simply overturn the approval of the plan and eliminate the extension. It would be to remand to EPA for a further explanation. Because there were other things going on in this plan approval and in the grant of the extension than just these two narrow issues. Petitioners haven't shown anything that would justify overturning the entire plan. But what if the plan were overturned? What happens? What is the relationship between the EPA and the state at that point? What are they supposed to do? What's the state supposed to do? I don't know that the state would be required to do anything. But that would be something that, you know, I'd have to. I can't speak to exactly what the state's role would be at that point. But as long as the approved SIF is still in place, then the state's still required to comply with that. I mean, that doesn't go away. But it's out of time. I beg your pardon? It's past its deadlines. Does it get sanctioned by EPA? What happens when it's already missed the deadlines? If for some reason we overturned an extension, then Arizona's already missed its deadlines. What happens when a state misses its deadlines and doesn't have an extension? There are various sanctions that kick in at various points. You know, in the particular facts of this situation where there's been such a history of, you know, extensions and new plans and approvals and, you know, how exactly it would come out if the state were originally granted an extension and the entire extension were overturned. To be honest, you know, off the top of my head, I don't know legally exactly where that would leave the state. But I think that's another reason that if the court is dissatisfied with a couple of narrow issues here, it's more appropriate to ask for further explanation than to simply throw the entire approval and the entire extension out. Thank you. Thank you. I'm not sure if you have any rebuttal time left, but if you don't, we'll give you some. Thank you, Your Honor. I actually have, I think, a little more than a minute, but I don't have a lot to add. I appreciate, obviously, your preparation. But in response to your question, Judge Bybee, my understanding is that if this court were to remand back to EPA, it would restart a sanctions clock that was staged by EPA that would provide that sanctions would kick in in a matter of months, and I'm sorry, I don't know off the top of my head. Are the sanctions, are they monetary? They are limitations on federal highway funds is the principal sanction, and there are more sanctions than I'm sorry. As I stand here right now, they have flown from my brain. And then the State of Arizona would obviously at that point come back to the drawing board, work with EPA, and could reapply for the extension, but meet the MSM requirements, meet the statutory requirements. Could you speak briefly, really briefly, about the agricultural measures? What's your 30-second response on that? My 30-second response to the agricultural measures is there's clearly a more stringent measure. It's the South Coast Rule 403. The state has not adequately demonstrated why that control measure is infeasible in the State of Arizona. They've declined to do so. Is that the stopping the tilling? That includes a mandatory no-till on high-wind days, and it also includes a kind of menu of options greater that requires just more work on the part of the individual farm operator. It's still a menu. It's just a matter of picking more items from the menu. It's still a menu. The parties do not disagree that Rule 403 is more stringent. That is not in disagreement. So what our position is is that Arizona may have to tailor the rule, but must adopt something as equally as stringent as Rule 403. But you haven't told us what Arizona should adopt. No, no, and that's not our role. That's between the state and EPA, but they're going to have to work off of Rule 403, and those aspects of 403 that they choose not to implement, they have to demonstrate. They can't simply assert without substance that they're infeasible. They have to demonstrate that they're either economically or technologically infeasible for Arizona. That's our position on that. I have nothing further unless you have more questions. Thank you very much. The case is submitted. Again, I want to thank both counsel for a very helpful presentation, and we will stand adjourned for this session.
judges: Graber, Wardlaw, Bybee